### KLEFFNER v SHEEHAN et

Common Pleas Court, Scioto Co

No 28502.    Decided Jan 28, 1937

H. J. Micklethwaite, Portsmouth, for plaintiff.

W. L. Dickey, John E. Gregg, W. A. Adams and Emory F. Smith, Portsmouth, for defendant.

## OPINION

By BAGBY, J.

The defendants are the city manager and chief of police of the city of Portsmouth, Ohio, the mayor and chief of police of the city of New Boston, Ohio, and Arthur Oakes, sheriff of Scioto County, Ohio.

The plaintiff has the exclusive right to use and is the owner of copyright issued by the Federal Government to one Charles H. Knull for the territory of Scioto County. The copyright in question was issued October 30, 1934, and is still in full force and effect.

The plaintiff says he is in the business of purchasing and selling candy mints throughout said county, has expended and will continue to expend large sums of money for the purchase of mints, automobiles, etc., pay storage, rents, and employ men adapted to the purpose, in their distribution. To promote these sales of mint the plaintiff has entered into a number of contracts, among others, one with Charles Kratzer located at 123 Second street in the city of Portsmouth. The mints in question are the standard size, weight, and quality of others sold for a like price.

The plaintiff further says that the business he is engaged in and proposes to engage in in distributing and disposing of said mints "is a legal business," and that the business of the merchants with whom he proposes to deal and who will make the sales to the public "is a legal business."

To promote such sales a mechanical device under said copyright is used. The copyright plate placed on the device for vending the mint has on it the following language:

### MINT VENDOR

"One package of Mints may be purchased by depositing a Five cent coin in the slot, and purchaser may also receive metal token, each of which if received on first purchase is redeemable here for five cents in trade.

## NOTICE

Depositing in this mechanical device, or attempting to operate same with, anything other than a five cent coin is unlawful and is strictly forbidden. No metal tokens, coupons or chips, will be redeemed unless same were obtained with first purchase and any consecutive alternate purchases shall not be a first purchase under the above restrictions."

There also appears on the device numerals and lettering as follows:

"For the deposit of a United States Five cent coin, the purchaser will receive one package of mints and the number of trade tokens indicated in the space to which the arrow is pointing is redeemable only as per restrictions below."

The arrow points to a space in which appears in Arabic numerals the number of trade tokens the purchaser will receive upon his purchase of one package of mints; in short it may be known by the purchaser or operator of the device how many tokens, if any, he will receive in connection with his purchase of a mint package before he makes the purchase. The number of tokens which may be received in operating the device ranges from three to twenty-five. These tokens may be used to further operate the device but all tokens received after the first purchase are not redeemable in trade.

It is to be noted that a device of similar character was declared to be a gambling instrument in the case of **Brassel v Benham et,** by the Court of Appeals of Clark county on Feb. 17, 1934. (17 Abs 257). Judge Barnes in writing the opinion in that case points out that the fact that the "merchant or his employees may prearrange and alternate with the individual for continuous play without any violation of the restrictions." The restrictions are those contained in the copyright on the face of the device.

On October 30, 1934, following this decision a new copyright was sought and obtained from the Federal Government under which it is now proposed to operate the device offered in evidence in this case.

The notice on the front of the device was changed in the new copyright by inserting in it the word "alternate." The restriction as it appeared on the device in the Brassel v Benham case was as follows:

## RESTRICTIONS

"Operating this machine with anything but U. S. 5 cent coin or making two of more consecutive purchases herein positively prohibited."

The corresponding notice on the device in the case at bar has already been quoted. The instant case and the Brassel v Benham case are in substance identical but for the presence of the word "alternate" in the instant case. Manifestly the concluding phrase in the Brassel case found in the syllabus "but not prohibiting consecutive alternate play" had something to do with the acquisition of the new copyright and the changes made in the notice or restrictions, and accounts for the presence of the word "alternate" in the restrictions on the present device. The device itself was not changed in any material respect. The use to which it may be put, it seems to me, should determine its character rather than the "restrictions" or "notices" appearing upon it That it is susceptible to use as a gambling device is obvious; too obvious to be overlooked.

The alleged purpose of the device is to promote the sale of mints. But a purchaser can not make a second consecutive purchase on the same unrestricted terms of his first purchase for he loses the value of the tokens which may accompany the second or subsequent purchases. This fact, it seems to me, affords and supplies strong inducement to collusive arrangements

among proposed purchasers to operate the device successively one after the other, any one of which may provide all of the money necessary for the operation; all in apparent accord with the restrictions. This collusive arrangement of course would promote the sale of mints while strict compliance with the letter of the restrictions, to say the least, has a strong tendency to retard the sales.

If one desires to use the device for gambling, all he need to do is to enter into an arrangement with several others of the same propensities, who usually associate together, before entering the place of its location, distribute the money among the several parties, enter the place at different times and continue to play to their heart's content. To all appearances this method would be in strict compliance with the restrictions contained in the copyright and the fact that nothing but the first purchases under the restrictions are fruitful of anything but the purchase of mints as already stated promotes the formation of such collusive arrangement. This has the added iniquity of involving greater numbers in the infamous transaction.

This conclusion that the instrument in question is a gambling device ordinarily would make it unnecessary to proceed further. But it seems proper to consider what the plaintiff himself manifestly thinks of the device he seeks to protect. That plaintiff himself believes this to be a gambling device or has serious doubt about it is apparent. Before he placed it in use or attempted to place it in use he submitted it to the inspection of the defendants, all of them officers having to do with the enforcement of the law against gambling. We quote this from his petition,

"Plaintiff further says that on the first day of September, 1935, the plaintiff exhibited and demonstrated the above described mechanical device to the defendants herein, Frank E. Sheehan, City Manager of the City of Portsmouth, Ohio; Harry S. Sheets, Chief of Police of the City of Portsmouth, Ohio;

Douglas Bowling, Mayor of the City of New Boston, Ohio; Clarence Highfield, Chief of Police of the City of New Boston, Ohio; and Arthur Oakes, Sheriff of Scioto County, Ohio."

The defendants condemned it as a gambling device. Quite obviously the potentialities of the device for gambling, some of which we have already pointed out, are not now fully known. Neither can they be fully known in the absence of its actual operation. But this situation we think may well be taken as ample explanation of why it is that the plaintiff first sought the approval of the defendants and failing in that now seeks the approval of this court before these potentialities could be fully known. If the plaintiff were engaged, or were about to engage, in what he believed to be a perfectly lawful enterprise about whose legality he had no doubt, no such steps would have been deemed necessary. He seeks a permanent injunction here, the consequence of which would be to tie the hands of those charged with the enforcement of the law against gambling in connection with a device about which he himself manifests doubt. How serious his doubt may be we can not know. But certain it is that he or those responsible for the production of the device in question know or ought to know more about its use as a gambling device than counsel in the case or the court. Suffice it to say that the plaintiff's own manifested doubt ought to create in the mind and conscience of a chancellor such doubt as to make him hesitate to employ the extraordinary remedy of injunction in behalf of such an instrument; for the court to share plaintiff's doubt is a matter about which he has no just cause for complaint.

"Gambling is said to be the greatest evil which confronts the people; it is the forerunner of crime and the breaking down of the morals of the people; it is one of the greatest causes of crime such as defalcations and embezzle-

ments. Gambling is based upon the lure to get something for nothing."

**O. Jur. Vol. 19, page 854. Gambling.**

Experience and observation teach that persons of the gambling spirit are most likely to associate together. Having this common propensity to gamble and confronted with the device in question in this case it seems but natural and most probable that they would enter into the conspiracy, if conspiracy it is, to carry out the arrangement indicated, by dividing up their money or the money of one among them, and appearing at intervals for the operation of the device, obtain the merchandise and then again come together and either divide it or deliver it to the one of their number who furnished the money.

The burden is on the plaintiff who asks an injunction to make out his case clearly. **O. Jur., Vol. 21, page 1000; Injunctions.**

"To entitle a party to an injunction his right must be clear. It is said that no rule in equity is better settled than this. Injunctions are issued to prevent injury to clear rights, and the cases which will justify interference of this kind are those of clear, incontestible, well defined rights. Courts will not exercise this extraordinary authority when the right is doubtful or the facts are not definitely ascertained." **Spangler v City of Cleveland, 43 Oh St 526; Miller v Miller, 28 Oh Ap 203; 162 N. E. 459.**

It follows that the finding on the issues in this case must be in favor of the defendants. The petition of the plaintiff will be dismissed at the costs of the plaintiff and his exceptions noted.

Entry accordingly.